**Docket No. 13-55484**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

MARK TOWLE,

*Defendant-Appellant,*

v.

DC COMICS,

*Plaintiff-Appellee.*

_____

*Appeal from a Decision of the United States District Court for the Central District of California,*
*No. CV-11-03934 · Honorable Ronald S.W. Lew*

## BRIEF OF APPELLEE

J. ANDREW COOMBS, ESQ.
J. ANDREW COOMBS,
   A PROFESSIONAL CORPORATION
517 East Wilson Avenue
Suite 202
Glendale, California 91206
(818) 500-3200 Telephone

ROGER L. ZISSU, ESQ.
JAMES D. WEINBERGER, ESQ.
LEO KITTAY, ESQ.
FROSS ZELNICK LEHRMAN
   & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
(212) 813-5900 Telephone

*Attorneys for Plaintiff-Appellee DC Comics*




## CORPORATE DISCLOSURE STATEMENT

DC Comics is a partnership.  The general partners of DC Comics are Warner Communications Inc. and E.C. Publications, Inc.  The ultimate parent of both Warner Communications Inc. and E.C. Publications, Inc. is Time Warner Inc., a publicly held corporation.  No publicly held corporation owns 10% or more of Time Warner Inc.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .....................................................i

TABLE OF AUTHORITIES .................................................................vi

SUMMARY OF ARGUMENT ...........................................................1

JURISDICTIONAL STATEMENT ......................................................4

STANDARD OF REVIEW ................................................................4

ISSUES PRESENTED..........................................................................4

STATEMENT OF THE CASE............................................................5

STATEMENT OF FACTS ..................................................................6

A.    The Parties ............................................................................6

B.    DC's Batman Property...........................................................6

C.    DC's Rights in Batman and the Batmobile .....................................7

    1.    Background .......................................................................7

        (a)    Copyrights in DC's Comics ........................................7

        (b)    Trademark Rights in BATMAN, BATMOBILE and the Bat Designs ...........................................8

        (c)    DC's Licensing Program........................................9

    2.    Agreements Related to the Series........................................10

        (a)    The 1965 ABC Agreement ......................................10

        (b)    The 1965 Barris Agreement.....................................11

        (c)    The 1966 Barris Agreement.....................................13

      3.     Agreements Related to the Film ........................................... 14

          (a)    The 1979 Agreement ..................................................... 14

          (b)    The 1988 Furst Agreement ...................................... 15

D.    Towle's Business ........................................................................ 15

ARGUMENT ................................................................................................. 16

I.      APPLICABLE PRINCIPLES OF COPYRIGHT LAW ............................. 16

    A.    Introduction ................................................................................ 16

    B.    Copyright Infringement ............................................................. 18

    C.    Derivative Works ....................................................................... 20

II.    TOWLE'S REPLICAS INFRINGE DC'S COPYRIGHTS ......................... 22

    A.    Introduction ................................................................................ 22

    B.    Towle Infringed DC's Copyrights
         in the Underlying Original Batmobile ....................................... 23

      1.     DC Owns Broad Rights in the Batmobile ..................... 23

      2.     The Batmobile is a Character Protectable under Copyright ..... 25

      3.     The Batmobile is Protectable as
             an Element of a Literary Work ....................................... 28

      4.     The Replicas are Unauthorized Derivative
             Works that Infringe the Batmobile ............................... 29

    C.    Towle Infringed DC's Copyrights
         in the 1966 and 1989 Batmobiles ............................................ 32

1.      Towle Infringed DC's Merchandising
        Rights in the 1966 and 1989 Batmobiles .................................33

2.      Towle Infringed DC's Copyrights in
        the 1966 and 1989 Batmobiles Designs...................................34

3.      Towle Infringed DC's Copyrights in the 1966 and 1989
         Batmobiles as Pictorial, Graphic or Sculptural Works...........37

D.      Towle's Additional Arguments Regarding
        Copyright Infringement are Meritless..................................41

1.      There is No "Gap" in Title
        Regarding the Furst Agreement .................................42

2.       The 1965 ABC Agreement
         was Binding upon Greenway and Fox .................................46

3.      Unilateral Design Patent Filings
        for Derivative Works do not Negate
        DC's Copyrights in the Batmobile............................................47

4.      Towle had Sufficient Notice
        of the Relevant Copyright Registrations...................................49

III.    TOWLE'S REPLICAS INFRINGE DC'S TRADEMARK RIGHTS............50

A.      The Replicas are Likely to Cause Confusion ......................................51

1.      The DC Marks are Strong ........................................................52

2.      The Goods and Services are Identical........................................53

3.      The Marks are Identical ..........................................................53

4.      Towle Willfully Infringed the DC Marks .................................54

5.      Actual Confusion Occurred ......................................................55

6.      Marketing Channels are Identical ............................................56

7.    Consumers' Degree of Care is Not
Sufficient to Prevent Confusion ................................................ 56

B.    None of Towle's Additional Arguments Undermine the
District Court's Finding of Trademark Infringement ......................... 57

C.    Towle May Not Assert Laches ........................................... 59

CONCLUSION ....................................................................... 60

CERTIFICATE OF COMPLIANCE ..................................................... 62

STATEMENT OF RELATED CASES .................................................... 63

# TABLE OF AUTHORITIES

## CASES

*AMF Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) ................................................................51, 55, 56

*Academy of Motion Picture Arts & Sciences v. Creative House
Promotions, Inc.,*
944 F.2d 1446 (9th Cir. 1991) .....................................................................54, 55

*Ameritech, Inc. v. American Information Technologies Corp.,*
811 F.2d 960 (6th Cir. 1987) ........................................................................ 59-60

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986).............................................................................................28

*Anderson v. Stallone,*
87-0592 (WDK), 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ............25, 26, 28

*Apple Computer, Inc. v. Microsoft Corp.,*
35 F.3d 1435 (9th Cir. 1994) .....................................................................18, 30

*Applied Information Sciences Corp. v. eBay, Inc.,*
511 F.3d 966 (9th Cir. 2007) .............................................................................51

*Berkic v. Crichton,*
761 F.2d 1289 (9th Cir. 1985) ...........................................................................17

*Bespaq Corp. v. Haoshen Trading Co.,*
04-CV-3698 (PJH), 2005 WL 14841 (N.D. Cal. Jan. 3, 2005) ........................50

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
174 F.3d 1036 (9th Cir. 1999) .............................................................51, 52, 53

*Cavalier v. Random House, Inc.,*
297 F.3d 815 (9th Cir. 2002) .............................................................................29

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
251 F.3d 1252 (9th Cir. 2001) ...........................................................................55

*DC Comics Inc. v. Reel Fantasy, Inc.,*
696 F.2d 24 (2d Cir. 1982) .................................................................................25

*Danjaq L.L.C. v. Sony Corp.,*
263 F.3d 942 (9th Cir. 2001) .............................................................................59

*Dreamwerks Production Group, Inc. v. SKG Studio,*
  142 F.3d 1127 (9th Cir. 1998) ...............................................................52

*Durham Industries, Inc. v. Tomy Corp.,*
  630 F.2d 905 (2d Cir. 1980) .................................................................21

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
  967 F.2d 1280 (9th Cir. 1992) ..................................................... *passim*

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
  697 F.2d 27 (2d Cir. 1982) ..................................................................43

*Electropix v. Liberty Livewire Corp.,*
  178 F. Supp. 2d 1125 (C.D. Cal. 2001) ....................................... 52-53

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,*
  122 F.3d 1211 (9th Cir. 1997) ..................................................... *passim*

*Feist Publications, Inc. v. Rural Telegraph Service Co.,*
  499 U.S. 340 (1991).................................................................18, 30

*Fleischer Studios, Inc. v. A.V.E.L.A. Inc.,*
  772 F. Supp. 2d 1155 (C.D. Cal. 2009) ...............................................51

*Four Navy Seals v. Associated Press,*
  413 F. Supp. 2d 1136 (S.D. Cal. 2005) ...............................................50

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.,*
  462 F.3d 1072 (9th Cir. 2006) ............................................................19

*Gaiman v. McFarlane,*
  360 F.3d 644 (7th Cir. 2004) ..............................................................23

*General Electric Co. v. Joiner,*
  522 U.S. 136 (1997).................................................................4, 44

*Glow Industries, Inc. v. Lopez,*
  252 F. Supp. 2d 962 (C.D. Cal. 2002) ...........................................52, 56

*Greenberg v. National Geographic Society,*
  244 F.3d 1267 (11th Cir. 2001), *cert. denied*, 534 U.S. 951 (2001) .................21

*Grupo Gigante SA De CV v. Dallo & Co., Inc.,*
  391 F.3d 1088 (9th Cir. 2004) ...............................................................4

*HMH Publishing Co. v. Brincat*,
    504 F.2d 713 (9th Cir. 1974) ...............................................................57

*HTI Holdings, Inc. v. Hartford Casualty Insurance Co.*,
    10-CV-6021 (TC), 2011 WL 4595799 (D. Or. Aug. 24, 2011) ........................45

*Halicki Films, L.L.C. v. Sanderson Sales & Marketing*,
    547 F.3d 1213 (9th Cir. 2008) ........................................... 16-17, 27, 39

*Harper v. Wallingford*,
    877 F.2d 728 (9th Cir. 1989) ......................................................28, 46

*Hermes International v. Lederer de Paris Fifth Avenue, Inc.*,
    219 F.3d 104 (2d Cir. 2000) ...............................................................59

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*,
    739 F.3d 446 (9th Cir. 2014) ...............................................................40

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002) ......................................................4, 59

*Leicester v. Warner Brothers*,
    232 F.3d 1212 (9th Cir. 2000) ...............................................................38

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    632 F.2d 817 (9th Cir. 1980) ...............................................................55

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) ...............................................................56

*Lewis v. Gallob Toys, Inc. v. Nintendo of America, Inc.*,
    964 F.2d 965 (9th Cir. 1992) ...............................................................41

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
    740 F.2d 718 (9th Cir. 1984) ......................................................39, 41

*Magnuson v. Video Yesteryear*,
    85 F.3d 1424 (9th Cir. 1996) ...............................................................43

*Mazer v. Stein*,
    347 U.S. 201 (1954)......................................................................47, 48

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) ...............................................................18

*Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995) .......................................... *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006) ...............................................45

*Milne v. Stephen Slesinger, Inc.*,
    02-CV-8508 (FMC)(PLAx), 2007 WL 7646410,
    (C.D. Cal. Feb. 15, 2007).....................................................................46

*Morris v. Guetta*,
    12-CV-0684 (JAK), 2013 WL 440127 (C.D. Cal. Feb. 4, 2013)......................19

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ..............................................................19

*National Lead Co. v. Wolfe*,
    223 F.2d 195 (9th Cir. 1955) ..............................................................59

*New Line Cinema Corp. v. Russ Berrie & Co.*,
    161 F. Supp. 2d 293 (S.D.N.Y. 2001) ...................................27, 28, 39

*New Line Cinema Corp. v. Easter Unlimited, Inc.*,
    17 U.S.P.Q.2d 1631 (E.D.N.Y. 1989) .................................................27

*Norris Industrial, Inc. v. International Telegraph & Telegraph Corp.*,
    696 F.2d 918 (11th Cir. 1983) ............................................................40

*Norse v. Henry Holt & Co.*,
    991 F.2d 563 (9th Cir. 1993) ..............................................................19

*Olson v. National Broadcasting Co.*,
    855 F.2d 1446 (9th Cir. 1988) ............................................................25

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*,
    274 F.2d 487 (2d Cir. 1960) ...............................................................31

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*,
    354 F.3d 1020 (9th Cir, 2004) .....................................................54, 55

*Range Road Music, Inc. v. East Coast Foods, Inc.*,
    668 F.3d 1148 (9th Cir. 2012) ...................................................... 19-20

*Reno Air Racing Association, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ............................................................58

*S.O.S., Inc. v. Payday, Inc.*,
  886 F.2d 1081 (9th Cir. 1989) .......................................................35

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ......................................................30, 31

*Shaw v. Lindheim*,
  919 F.2d 1353 (9th Cir. 1990) .......................................................18

*Sid & Marty Krofft Television Products, Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir. 1977) .......................................................19

*Smith v. Airborne Freight Corp.*,
  172 F.3d 58 (9th Cir. 1999) ..........................................................44

*Stewart v. Abend*,
  495 U.S. 207 (1990).....................................................................20

*Suntrust Bank v. Houghton Mifflin Co.*,
  268 F.3d 1257 (11th Cir. 2001) .....................................................31

*Surfvivor Media, Inc. v. Survivor Products*,
  406 F.3d 625 (9th Cir. 2005) .........................................................52

*Switsky v. Carey*,
  376 F.3d 841 (9th. Cir. 2004) ........................................................18

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000) .....................................................18, 19

*Toho Co. v. William Morrow & Co.*,
  33 F. Supp. 2d 1206 (C.D. Cal. 1998)...................................26, 27, 51

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
  715 F.2d 1327 (9th Cir. 1983) .......................................................32

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992).....................................................................52

*U.S. Auto Parts Network, Inc. v. Parts Geek, L.L.C.*,
  692 F.3d 1009 (9th Cir. 2012) .......................................................20

*Universal Pictures Co. v. Harold Lloyd Corp.*,
  162 F.2d 354 (9th Cir. 1947) .........................................................29

*Vestron, Inc. v. HBO, Video Inc.*,
   839 F.2d 1380 (9th Cir. 1988) ...........................................................37

*Walt Disney Products v. Air Pirates*,
   345 F. Supp. 108 (N.D. Cal. 1972) .....................................................32

*Walt Disney Products v. Air Pirates*,
   581 F.2d 751 (9th Cir. 1978) ...........................................................25

*Warner Brothers Inc. v. American Broadcasting Companies*,
   720 F.2d 231 (2d Cir. 1983) .........................................................24, 25

*Warner Brothers Pictures, Inc. v. Columbia Broadcasting System, Inc.*,
   216 F.2d 945 (9th Cir. 1954) .......................................................26, 35

*Western Stove Co. v. Geo. D. Roper Corp.*,
   82 F. Supp. 206 (D. Cal. 1949) .........................................................58

*Williamson v. Life Insurance Company of North America*,
   10-CV-0499 (KJD), 2012 WL 3262857 (D. Nev. Aug. 8, 2012).....................45

*Wrenn v. Boy Scouts of America*,
   03-CV-4057 (JSW), 2008 WL 4792683 (N.D. Cal. Oct. 28, 2008)..................58

*In re Yardley*,
   493 F.2d 1389 (C.C.P.A. 1974) .........................................................48

*Zenix Industrial USA, Inc. v. King Hwa Industrial Co.*,
   920 F.2d 937 (9th Cir. 1990) ...........................................................43

## STATUTES

15 U.S.C. § 1115 ...............................................................................9, 53

15 U.S.C. § 1125 ................................................................................50

17 U.S.C. § 7 ....................................................................................20

17 U.S.C. § 101 ...........................................................................*passim*

17 U.S.C. § 102 .......................................................................16, 37, 38

17 U.S.C. § 103 .................................................................................20

17 U.S.C. § 106 .................................................................................17

17 U.S.C. § 201 .................................................................17, 18, 33

17 U.S.C. § 204 .................................................................................43

17 U.S.C. § 410 ........................................................................*passim*

17 U.S.C. § 501-05 ...........................................................................17

## RULES & REGULATION

Fed. R. App. P. 32 ............................................................................62

Fed. R. Civ. P. 30 ............................................................................45

Fed. R. Civ. P. 56 ............................................................................46

Fed. R. Evid. 602 ............................................................................44

Fed. R. Evid. 801 ............................................................................45

35 C.F.R. § 202 .........................................................................47, 48

## TREATISES

J. Thomas McCarthy,
    *McCarthy on Trademarks & Unfair Competition* (4th ed. 2013) ..........54, 55, 58

Melville B. Nimmer & David Nimmer,
    *Nimmer on Copyright* (2013)........................................................*passim*

Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Civil Procedure Civil* § 2103 (3d ed. 2010).......................45

## MISCELLANEOUS

60 Fed. Reg. 57 (Mar. 24, 1995).......................................................48, 49

H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. (1976)................................. 20, 37-38

Plaintiff-Appellee DC Comics ("DC") submits this Answering Brief in Opposition to the appeal of Defendant-Appellant, Mark Towle ("Towle").

## SUMMARY OF ARGUMENT

Towle has built a business trafficking in intellectual property associated with DC's celebrated character "Batman." He admits to using the Batman trademarks and to copying Batman's iconic Batmobile without authorization. His principal attack on the judgment below is to challenge DC's ownership, even though DC has continuously and exclusively published and exploited Batman works that feature the Batmobile for over seventy years. No record evidence supports Towle's theory; rather, the evidence establishes DC's complete ownership of Batman and the Batmobile and demonstrates Towle's infringement thereof.

DC is one of the best known and successful publishers of comic magazines in the world, and owns the Batman property, including the Batmobile. Towle, who operates under the name "Gotham Garage," is in the business of fabricating knock-off automobiles, principally versions of Batman's famous car, the Batmobile. Towle concedes that he has slavishly copied the appearance of the Batmobile and used Batman trademarks to market his replicas. He even provides evidence that he has intentionally exploited the substantial goodwill that DC has built in the Batmobile works and marks. His advertisements promise that, as consumers drive their "Batmobile Replicas" through the neighborhood, they will receive "Fame and

Recognition" whenever the public sees "the Caped Crusaders arrive." Towle's appropriation of DC's intellectual property has been good business. Customers pay $90,000 for his Batmobile upgrades, which come complete with Bat tailfins, a Batphone, Bat emblems on the hubcaps and myriad other Bat-devices. DC, however, has never authorized Towle to use the Batmobile or any part of its Batman property and, in fact, has an authorized licensee who pays DC a royalty for the right to make Batmobile replicas.

The District Court granted DC's motion for summary judgment on its copyright, trademark and unfair competition claims. Here, Towle effectively concedes the trademark and unfair competition claims, as he did below, but continues to contest the copyright claim. The District Court correctly held that Towle infringed two distinct sets of DC's rights under copyright: (i) DC's rights in the Batmobile as it appeared in the *Batman* comic books and (ii) DC's rights in the derivative 1966 Batmobile (the "1966 Batmobile") from the licensed television series starring Adam West (the "Series") and the 1989 Batmobile (the "1989 Batmobile") from the licensed film starring Michael Keaton (the "Film"). As to the comics, Towle concedes that DC owns all rights in the comic books, but argues that his replicas do not infringe the comic Batmobile because they are copied from later works. As to the 1966 and 1989 Batmobiles, Towle concedes that his replicas

are close copies and therefore infringing, but argues that DC does not own rights in those works.

Towle is wrong, on both counts. The Batmobile, as described and depicted in the comics, is subject to copyright protection as a character or original expressive story element, and Towle used the Batmobile's original expressive elements in creating his replica cars. As to the 1966 and 1989 Batmobiles, DC expressly reserved in the relevant license agreements its broad rights under copyright in the Batman property and in all merchandising rights associated with the Series and Film. Those same agreements even granted DC ownership in any newly added creative visual elements related to Batman, including in any updated Batmobiles. Moreover, since the 1966 and 1989 Batmobiles are based on the Batmobile that appears in the comics and include many of its protected expressive elements, they are "derivative works" of the original Batmobile. Had DC not authorized production of the Series and Film, the 1966 and 1989 Batmobiles would infringe DC's copyrights, just as Towle's copies do.

Towle offers a number of other frivolous arguments in favor of reversal of the District Court's ruling on DC's copyright claims, but these fare no better. Towle is an admitted copier of DC's rights who profits enormously from his schemes, and has no legal basis to justify them. The District Court's opinion should be affirmed in its entirety.

## JURISDICTIONAL STATEMENT

DC agrees with Towle's statements regarding jurisdiction, appealability and timeliness.

## STANDARD OF REVIEW

This Court reviews the District Court's finding of summary judgment *de novo*, *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004), but reviews its decision regarding whether to apply laches for "abuse of discretion." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 833 (9th Cir. 2002).[1] Evidentiary decisions are also reviewed for abuse of discretion. *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997).

## ISSUES PRESENTED

1.     Did the District Court properly grant summary judgment to DC on its claims that Towle's replica Batmobiles violated its rights under the Copyright Act?

---

[1] Although Towle references the rule that this Court reviews a District Court's grant of permanent injunction using the "abuse of discretion" standard, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1296 (9th Cir. 1992) (Br. at 5), he makes no argument regarding the permanent injunction and could not do so, given his stipulation thereto (ER 9-11). Accordingly, if this Court affirms the District Court's decision, the injunction order should be affirmed as well.

2.     Did the District Court properly grant summary judgment to DC on its claims that Towle's replica Batmobiles, his advertising and use of bat symbols violated its rights under trademark and unfair competition law?[2]

## STATEMENT OF THE CASE

On February 7, 2013, the District Court issued an order (Excerpts of Record ("ER") 12-65.) (i) denying Towle's motion for partial summary judgment on DC's copyright, trademark and unfair competition claims, including on Towle's laches defense to the copyright and trademark claims; (ii) granting DC's motion for partial summary judgment except on Towle's laches defense to copyright infringement, which it denied.  The District Court also issued orders (i) overruling certain of Towle's evidentiary objections (ER 74-76); and (ii) ruling on DC's evidentiary objections (ER 77-81).

On February 20, 2013, the parties entered into a stipulation as to the substance of the permanent injunction to be entered in DC's favor.  (ER 9-11.)

On February 22, based on that stipulation and its Order, the District Court issued a permanent injunction, enjoining Towle from using DC's intellectual property pending an appeal to this Court, and entered Judgment for DC and against Towle, awarding DC $70,000.  (ER 1-8.)

---

[2] Towle also disputes certain evidentiary rulings of the District Court.  We address these as required when the evidence relates to a particular substantive point.

## STATEMENT OF FACTS

### A.    The Parties

DC is a New York General Partnership consisting of E.C. Publications, Inc. and Warner Communications Inc.  (ER 1551.) DC is successor-in-interest to Detective Comics, Inc., National Comics Publications, Inc., National Periodical Publications, Inc. and DC Comics Inc.  (ER 1543.)

Towle manufactures unauthorized replicas of famous and distinctive vehicles that have appeared on television and film, most notably the Batmobiles from the Series and Film.  (ER 1788-89.)

### B.    DC's Batman Property

One of DC's most successful and famous characters featured in its publications is Batman, an iconic fictional hero of the modern era.  (ER 299.) Since his introduction in 1939, Batman has appeared in comic books, motion pictures, television series, and licensed merchandise, all distributed throughout the United States.  (ER 299, 300, 304, 310, 312.)  Through DC's extraordinary nurturing of the Batman mythos, the character and his universe have captured the popular imagination, such that the Batman lore has become one of a rarified group of legends known and loved throughout the world.  (ER 299.)

A key and famous element of the Batman comic books and universe of related works in other media (the "Property") is Batman's trusted Batmobile (the

"Batmobile"), introduced in 1941.  (ER 300.)  Regularly appearing in Batman works, this dark, powerful automobile is consistently designed with cutting-edge (and fantastical) bat-themed gadgets and finishings that assist Batman in fighting crime and escaping villains.  (ER 1460-1511.)  The Batmobile's characteristics and qualities have been portrayed in the text and drawings for over seven decades in DC's publications.  (ER 300.)  And, however many transformations, iterations and updates the Batmobile has undergone, it is always referred to by this name.  (ER 300, 1460-1511.)

### C.    DC's Rights in Batman and the Batmobile

As discussed herein, while Towle questions DC's ownership rights in certain later copyrighted versions of the Batmobile, the existence of protection for the Batman copyrighted works and trademarks is essentially uncontested.

### 1.    Background

#### (a)    Copyrights in DC's Comics

Batman first appeared in March 1939 in DC's *Detective Comics*.  DC is the owner of the comics it has published featuring and depicting Batman including all characters, components and elements depicted therein, including the Batmobile (the "Comics"), and consequently, all title and interest in and to the copyrights associated therewith, and has enforced them vigorously.  (ER 299, 301-02, 897.)  DC attached to the First Amended Complaint ("FAC") a representative sample of

copyright registrations of Batman comics and produced others during discovery to support its claim.  (ER 301-02, 1246-47, 1313-1414, 1513-541, 1918-19.)

          **(b)**      **Trademark Rights in BATMAN,
BATMOBILE and the Bat Designs**

DC has enormously strong trademark rights in the BATMAN and BATMOBILE marks (the "Word Marks") based on longstanding and widespread use in commerce in connection with comics and other entertainment properties, as well as merchandise including toys, household goods and automotive products. (ER 299, 300, 310, 312-13.)   In addition, DC has acquired through use strong trademark rights in certain bat designs (the "Bat Designs," collectively with the Word Marks the "DC Marks") that have been used in connection with many goods and services and have become marks linked in the public's mind with Batman and DC.  (ER 312-14.)  These include:



Bat Emblem



Bat Emblem (Batman Begins)

8



Bat Rep II



Bat Emblem (1966)

DC owns U.S. trademark registrations for the DC Marks, including those listed in the FAC, many of which have become incontestable pursuant to 15 U.S.C. § 1115(b). (ER 313-14; 1920-21.)

### (c)  DC's Licensing Program

For decades DC has engaged in a robust licensing program of Batmobile copyrights and Marks. (ER 312, 689-817, 1554.) DC has granted a license to George Barris ("Barris"), the designer of the 1966 Batmobile, for exhibitions (ER 938, 943), toy companies for sale of toy and model cars (ER 312, 705-07, 710-17, 728-745) and Fiberglass Freaks, an automobile customizer, to produce full-size Batmobile replicas (ER 313, 911-923), among others. DC has also licensed the DC Marks and copyrights in connection with many other goods and services including household goods and automotive products. (ER 689-817.)

### 2.     Agreements Related to the Series

### (a)     The 1965 ABC Agreement

In 1965, DC licensed limited television rights in the Property to American Broadcasting Company's ("ABC") network for a Series to be produced by Greenway Productions, Inc. ("Greenway") and Twentieth Century-Fox Television, Inc. ("Fox").  (ER 580-606.)  In this agreement (the "1965 ABC Agreement"), DC granted ABC the rights to produce, distribute and exhibit the Series and secure copyrights in the completed episodes.  (ER 580-82.)  The agreement characterized the rights being granted as "a limited license."  (ER 601-02.)  Critically, while the agreement contemplated that ABC would own the copyright in the completed episodes, it did not transfer any rights in the Batman property, explicitly referencing "the copyright in the picture as distinguished from the copyright in the property."  (ER 602.)  As to the latter, the agreement required ABC to place on the episodes "a copyright notice designated by [DC] in the name of [DC] as the copyright owner thereof."  (ER 601-02.)

Thus, except for the protective copyright in the completed episodes, all other rights in the Batman property were expressly reserved to DC.  (ER 582.)  These included merchandising rights, which were the subject of a separate "Merchandising Rights" section in the agreement:

> [DC] shall *retain and shall have the sole and exclusive right* to
> produce and sell, license or grant to others the right to produce and

> sell or license or to enter into agreements with respect to the production, distribution and exploitation of endorsements, commercial tie-ups or manufacturing privileges under which *a commodity, product or service* is made, manufactured or distributed under the name of "Batman" or *any other character* in the comic book series entitled "Batman", or under a name which incorporates *any phrase, clause or expression* used in the comic strip or comic book or in the television series . . . .

(ER 594-95 (emphases added).)  In short, the agreement assigned away no rights in the Batmobile or any other aspect of the Property.

### (b)    The 1965 Barris Agreement

After obtaining rights to make the Series under the 1965 ABC Agreement, Fox and Greenway commissioned Barris, a car customizer, to build a version of the Batmobile for use in the Series.  (ER 1291-1303.)  Under the agreement (the "1965 Barris Agreement"), the 1966 Batmobile was to be designed based on certain drawings and to include a long list of bat-themed features listed in the agreement's Article 10 and Exhibit E.  Such features included the vehicle's "Batface, Bateyes, Batwing Rear Fenders, double cockpit, cockpit arch, jet intakes and exhaust," as well as:

1.    The Switches and Hand-throttle knob for the Turbo-electric Drive.

2.    The Bing-Bong Warning Bell and Bat-Light Flasher.

3.    The Mobile Phone between the seats with Beeper and Flashing Light.

4.    The Batscope, with TV-like Viewing Screen on the dash with control buttons and Radar-like Antenna with aimable parabolic Reflector outside, with cockpit controls.

5.     Anti-theft System – Flashing Red Lights – Piercing Whistle – Little rockets built into tubes at the back of the cockpit that fire straight up with a fiery whoosh.

6.     Anti-fire Control System – Flood of Foam from Secret Nozzle.

7.     Turn-off switch for Protection Systems.

8.     Radar-like screen that Beeps and Blips and points an arrow as it picks up Robin's directional signal.

9.     Mechanics for Emergency Bat Turn – Red Lever so named on Dash – Reverse Thrust Rockets beneath headlights – Ejection Parachute Mechanism at rear.

10.     Bat-Ray Projector Mechanism – Lever on Dash so named – Hood Hydrolic Projector Device. (With possibility of ray coming from Bat-Eyes).

11.     Portable Fire-Extinguisher.

12.     Receiver and Sender Computer to be installed in trunk of Batmobile.

13.     Bat Symbols on hubcaps.

14.     The color of the Batmobile and the Bat Symbols to be placed thereon . . . .

15.     Special luminescent paint to define Bat outline at night . . . .

(ER 1291-92, 1298, 1302-03.) Although the agreement provided that Fox, Greenway and Barris own certain aspects of the design, Article 7 limits those to non-"Batmobile features":

Any and all right, title and interest in and to the design of the Batmobile I resulting from the application of the required Batmobile features in and to Owner's prototype Lincoln chassis, *save and except the name "Batmobile" and the Batmobile features set forth in Article 10 hereof and in the drawings and exhibits attached hereto*, and of the completed Batmobile I provided for in Article 2 hereof, shall forever be vested in and owned jointly by Owner [Barris] and Producer [Fox and Greenway], *subject only to any and all right, title and interest of*

[DC's predecessor] . . . *in and to said Batmobile features in said design*.

(ER 1294-95 (emphases added).)  DC, although not a party to this agreement, confirmed this limited grant in a 1966 agreement with Barris, discussed below. (ER 607-616.)

### (c)    The 1966 Barris Agreement

Consistent with DC's ownership of rights therein, in 1966, DC granted Barris permission to manufacture two copies of the 1966 Batmobile and exhibit them for profit. *Id.* The agreement (the "1966 Barris Agreement") between DC, Fox, Greenway and Barris provided that: Barris affix copyright and trademark notices on these two Batmobiles in the name of DC's predecessor-in-interest (ER 610-11); any resulting good will "from the exhibition of said vehicles would belong exclusively to" DC (ER 612); and, on termination, Barris had to "immediately dismantle the BATMAN features of the exhibition vehicles so that they are not recognizable as Batmobiles or suggesting of BATMAN." (ER 612-13.) Finally, DC acknowledged Fox, Greenway and Barris's joint ownership of the design, but only *as to the non-"Batmobile features" as provided in Article 7 of the 1965 Barris Agreement.* (ER 615-16.)

### 3.     Agreements Related to the Film

#### (a)     The 1979 Agreement

In 1979, DC granted Batman Productions, Inc. ("BPI") a limited license to the Property for motion pictures (the "1979 Agreement"). (ER 617-643.) All other rights were reserved, including an explicit reservation of publication and merchandising rights in the "property." (ER 622-24.) Included in the definition of licensed "property" was the "'Batmobile,' as depicted and contained in the [Comics]," and "[a]ll literary, dramatic and photographic material relating to the foregoing as contained in the [Comics] and the themes, plots, situations, sequences, pictorial action, dialogue, drawings and sketches contained in [the Comics]." (ER 618.) Moreover, DC reserved all publication and merchandising rights in "Additional Elements," defined as "any device or thing newly created by Purchaser and which, but for the operation of this agreement, would constitute an infringement of DC's copyright or trademark in or to any device or thing contained in the Property." (ER 623-24, 632-33.) Although the "property" explicitly included the Batmobile, any new design elements would constitute "Additional Elements." (ER 618, 632-33.) Furthermore, the right to produce, offer or license replicas or automobile customization services was a merchandising right under the agreement. (ER 623-24 (including "right to license merchandisers of products or services to reproduce and/or use any 'prop', equipment, device or costume newly

designed and created for any motion picture produced hereunder").) The agreement also required BPI to place on all material that contained "the 'Batmobile'" copyright and trademark notices designating DC as the "owner and proprietor of . . . the 'Batmobile.'" (ER 633.) BPI later assigned its rights under the agreement to DC's affiliate Warner Bros. Inc. ("WBI") (ER 644-652.)

### (b)    The 1988 Furst Agreement

On April 5, 1988, another DC affiliate, Warner Bros. Productions Limited ("WBPL"), hired Production Designer Anton Furst ("Furst") in connection with the Film, retaining all rights to Furst's work as work made-for-hire. The agreement (the "1988 Furst Agreement") provided, "All rights in the employee's services and any products thereof are and shall remain the absolute property and copyright of the company or its assigns." (ER 654.) Under this agreement, Furst designed the 1989 Batmobile and all rights to the design went to WBPL – which it holds subject to DC's reservation of rights.

### D.    Towle's Business

Towle creates and sells unauthorized replicas of automobiles featured in well-known entertainment properties. Much of his business consists of making replica 1966 and 1989 Batmobiles. (ER 317, 1790.) His products have a body and interior that mimic either the 1966 or 1989 Batmobile, including several functioning (and non-functioning) gadgets that the prop vehicles contained (the

"Replicas"), such as the iconic Bat Emblem on the hubcaps and car doors. (ER 1146-184.)

Towle has advertised the Replicas under the BATMOBILE mark, used the domain name *batmobilereplicas.com* to market his business, and promoted the Replicas as including features such as the "bat phone, wheel bats, bat ant[enna]." (ER 316, 1146-184, 1789.) His advertisements promised that customers would attract attention from the public because of the Replicas' association with Batman. (ER 1146 ("Never a shortage of photo seekers when the Caped Crusaders arrive."), ER 1147 ("This is the type of Fame and Recognition you can expect owning a Mark Towle creation!"), ER 1149 ("A crowd forms around the Famous 66 Batmobile. This is always the norm when you own a Towle built replica!").) Towle has commanded up to $90,000 to produce each Replica. He also has sold kits for customers to modify cars themselves. (ER 925, 968, 973, 1547.) Finally, Towle has sold vehicle parts and accessories featuring the DC Marks.

## ARGUMENT

## I.    APPLICABLE PRINCIPLES OF COPYRIGHT LAW

### A.    Introduction

Copyright protects "original works of authorship," 17 U.S.C. § 102(a), and extends not only to the work as a whole, but to sufficiently delineated elements contained therein. *Halicki Films, L.L.C. v. Sanderson Sales & Mktg.*, 547 F.3d

1213, 1224 (9th Cir. 2008); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995).  A copyright owner has numerous exclusive rights including the rights to reproduce the copyrighted work, prepare and authorize the preparation of derivative works based upon the copyrighted work, and distribute copies of the copyrighted work to the public.  17 U.S.C. § 106.  The unauthorized exercise of any of these exclusive rights constitutes infringement.   17 U.S.C. § 501-05.

Copyright ownership "vests initially in the author or authors of the work," 17 U.S.C. § 201(a), and "[i]n the case of a work made for hire, the employer or other person for whom the work is prepared is considered the author . . . ."  17 U.S.C. § 201(b).  In addition, "[a]ny of the exclusive rights comprised in a copyright, including any of the rights specified by section 106 may be transferred . . . and owned separately."  17 U.S.C. § 201(d)(2).  Furthermore, "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title."  *Id.*  Such provision for divisibility of copyright means that a copyright owner may transfer any specified exclusive right in a literary work, such as the right to produce and exploit a theatrical motion picture based on a novel, while retaining ownership of

all the other rights comprised in the work, such as book publication, home video and merchandising rights.  17 U.S.C. § 201(d)(2).

### B.    Copyright Infringement

To prove copyright infringement, a plaintiff must demonstrate:   (1) ownership of a valid copyright, and (2) copying of constituent, original elements of the work.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  A plaintiff may establish copying by showing that the works in question "are substantially similar in their protected elements," and that the infringing party had access to the copyrighted work.  *Metcalf v. Bochco*, 294 F.3d 1069, 1072 (9th Cir. 2002).  A plaintiff proves access by showing that a defendant had "an opportunity to view or to copy plaintiff's work."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (internal quotation marks omitted).  Where there is a high degree of access, courts require a lower standard of proof of substantial similarity. *Switsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990) ("inverse ratio rule").  In analyzing whether two works are substantially similar, a court must first distinguish between the protectable and unprotectable material and then determine whether the purportedly infringing work is substantially similar to the protectable material in the plaintiff's work.  *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994).

This Court employs a two-part test to determine whether the works are substantially similar: the "extrinsic" and "intrinsic" tests. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The extrinsic test is objective and based on whether specific elements, such as a work's subject matter and settings, "which can be listed and analyzed," have been taken. *Id.* The intrinsic test is "more subtle and complex," focusing on "whether the ordinary, reasonable audience would recognize the defendant's work as [based on] the plaintiff's work." *Morris v. Guetta*, 12-CV-0684 (JAK), 2013 WL 440127, at *4 n.6 (C.D. Cal. Feb. 4, 2013) (internal quotation marks omitted). "Once the extrinsic test is satisfied, the fact finder applies the intrinsic test." *Three Boys Music*, 212 F.3d at 485. "[If] the resemblance is so overwhelming as to mandate a finding of substantial similarity, the court should grant summary judgment to plaintiff." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10 (2013) ("*Nimmer*"); *see, e.g.*, *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076-77 (9th Cir. 2006) ("substantial similarity 'may often be decided as a matter of law'" (citing *Krofft*, 562 F.2d at 1164)). Copying can be shown without a substantial similarity analysis when defendants admit that they copied, *Norse v. Henry Holt & Co.*, 991 F.2d 563, 566 (9th Cir. 1993), or where defendants virtually duplicate an entire work, *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989). *See Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d

1148, 1154 (9th Cir. 2012) (direct copying makes substantial similarity analysis irrelevant).

Towle concedes that his Replicas are copies of the 1966 and 1989 Batmobiles. (ER 1104.) Accordingly, DC need not engage in the two-part substantial similarity test as to these works. However, Towle disputes that the Replicas (and the 1966 and 1989 Batmobiles) copy, are derivative works of, or otherwise infringe rights in the Batmobile portrayed in the Comics. (Br. at 44-47.)

## C.    Derivative Works

A derivative work is "any work based in whole, or in substantial part, upon a pre-existing work, if it satisfies the requirements of originality." 1 *Nimmer* § 3.01; *see also* 17 U.S.C. § 7 (Copyright Act of 1909, repealed). Section 103(b) of the 1976 Act, which also carries forward the 1909 rule applicable before 1978, *Stewart v. Abend*, 495 U.S. 207, 224 (1990), provides that the copyright in a derivative work extends only to the newly contributed material." 17 U.S.C. § 103(b). "[C]opyright in a 'new version' . . . has no effect one way or the other on the copyright or public domain status of the preexisting material." H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. at 57 (1976) (hereinafter "H. Rep."); *U.S. Auto Parts Network, Inc. v. Parts Geek*, *L.L.C.*, 692 F.3d 1009, 1016 (9th Cir. 2012); *accord Stewart*, 495 U.S. at 224.

A work qualifies as a derivative work (as opposed to a mere copy) if it "recast[s], transform[s], or adapt[s]" the underlying work.  17 U.S.C. § 101.  Moreover, the new aspects of the new work must be non-trivial additions.  *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980).  Mere reproduction of a prior work in a different format or medium does not create a derivative work.  *See, e.g.*, *Greenberg v. Nat'l Geographic Soc'y*, 244 F.3d 1267, 1274 (11th Cir. 2001), *cert. denied*, 534 U.S. 951 (2001) (mere transfer of work from analog to a digital format does not result in a derivative work); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1222 (9th Cir. 1997) (transforming "two-dimensional copyrighted characters into three-dimensional inflatable costumes" does not constitute derivative work).  On the other hand, the test of originality for a derivative work is "modest" and "minimal," requiring a "low threshold."  *Durham*, 630 F.2d at 910.

Finally, because a derivative work by definition is always "based upon" the preexisting work and therefore embodies protectable elements of the underlying work, 17 U.S.C. § 101 (defining "derivative work" as "based upon" the preexisting work), copying of a derivative work almost always infringes the underling work as well.

## II.    TOWLE'S REPLICAS INFRINGE DC'S COPYRIGHTS

### A.    Introduction

Towle's infringement of DC's copyrights is twofold: he infringed the Batmobile from the Comics, and the 1966 and 1989 Batmobiles from the Series and Film, respectively.

Regarding the Batmobile in the Comics, Towle concedes that DC owns the copyrights in the Comics, but contests that the Batmobile is a protectable element of the Comics and that the Replicas infringe the Batmobile portrayed therein.  Yet, the Batmobile is sufficiently delineated to constitute a protectable character and story element under copyright, and the Replicas utilize the expressive elements thereof so as to be substantially similar.   Thus, the Replicas are plainly infringements.

Regarding the 1966 and 1989 Batmobiles, Towle concedes that his Replicas are copies, but contests DC's ownership.  There is no genuine issue of fact, however, that DC owns rights under copyright in the 1966 and 1989 Batmobiles because, when DC authorized their productions, it explicitly retained and reserved rights under copyright in the works and newly added elements thereto.  Towle incorporated these same elements into the Replicas.

We address each type of infringement in turn.

### B.    Towle Infringed DC's Copyrights in the Underlying Original Batmobile

Towle's replicas infringe the Batmobile as it has been portrayed over many decades in the Comics: the Batmobile is protectable as a character or element of the Comics, and the Replicas are substantially similar to it.

### 1.    DC Owns Broad Rights in the Batmobile

As the District Court held and Towle has stipulated, DC owns the copyrights in the Comics, which depict and describe the Batmobile. (ER 13, 1460-1511, 1543-44.) DC identified in the FAC a representative sample of its copyright registrations in Comics, each of which was made pursuant to work-for-hire agreements, and produced additional registrations in discovery. (ER 1905, 1918-19, 1512-541.) *See also Gaiman v. McFarlane*, 360 F.3d 644, 649-50 (7th Cir. 2004) (noting DC's work-for-hire agreements mean DC "own[s] the copyrights on [its] work"). These certificates are *prima facie* evidence of the copyrights' validity and the facts stated therein. 17 U.S.C. § 410(c); *see Entm't Research Grp.*, 122 F.3d at 1217. At no time has Towle offered any evidence to contradict or rebut these registrations.

The Batmobile has been sufficiently delineated in the Comics over the last seventy years to warrant copyright protection. (ER 44-52.) The Comics portray the Batmobile as a sleek, dark, aerodynamic car replete with state-of-the-art, bat-themed gadgetry and designs and as a vehicle that Batman relies on to fight crime

and capture villains.  (ER 1460-1511.)  Part of the Batmobile's lore is that it is frequently updated and modernized and equipped with seemingly infinite, surprising gadgets that Batman conveniently needs at a crucial moment.  (*Id.*)  Because the Batmobile is a cutting-edge, stylish vehicle, many of its design elements and capabilities in the 1930s have been revised over the subsequent decades.  (*Id.*)  However, its primary visual characteristics have remained, specifically, the vehicle's dark color, sleek profile, bat-themed front end, exaggerated fenders, jet engine after-burner, batfin motif and curved windshield, as well as the assortment of switches, lights and dials associated with its many gadgets.  (*Id.*)  In addition, the Batmobile has always been fast, reliable and indestructible, remaining hidden in the Batcave until Batman needs it.  (*Id.*)

Moreover, the visual and narrative depictions in the Comics have given the Batmobile depth and personality.  *See Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983) ("courts have generally considered not only the visual resemblance but also the totality of the [cartoon] characters' attributes and traits").  As the District Court noted, in one issue "the Batmobile 'leaps away and tears up the street like a cyclone; . . . an 'impatient steed straining at the reigns,' shivering 'as its supercharged motor throbs with energy . . . . [A]n instant later it tears after the fleeing hoodlums.'"  (ER 49, 1462-63.)  Later, the Batmobile is driven off a cliff and reappears unharmed, revealing its special indestructibility.  (ER 1461-62.)

Based on such images and storyline, the District Court found: "The comic books portray the Batmobile as a superhero. The Batmobile is central to Batman's ability to fight crime and appears as Batman's sidekick, if not an extension of Batman's own persona." (ER 50.)

### 2. The Batmobile is a Character Protectable under Copyright

The District Court properly held that the Batmobile is a protectable character under copyright. "[I]t is clearly the prevailing view that characters *per se* are entitled to copyright protection." 1 *Nimmer* § 2.12 (citing, *inter alia*, *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978)); *see also DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982) (recognizing "DC's property in the Batman character").

This Court has held that "especially distinctive" characters warrant protection apart from the copyrighted work, *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988), and has been particularly receptive to character protection for graphic characters, including comic book characters. *See, e.g.*, *Air Pirates*, 581 F.2d at 755 (several comic book characters protected); *Am. Broad. Cos.*, 720 F.2d at 240-45 (Superman protectable). Indeed, this Court has distinguished graphically depicted characters from literary characters, essentially creating a lower standard for the "protectability of graphic characters." *Anderson v. Stallone*, 87-0592 (WDK), 1989 WL 206431, at *6 (C.D. Cal. Apr. 25, 1989); 1

*Nimmer* § 2.12.[3]  "As a practical matter, a graphically depicted character is much more likely than a literary character to be fleshed out in sufficient detail so as to warrant copyright protection."  *Anderson*, 1989 WL 206431, at *7 (Rocky Balboa); *see also Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998) (Godzilla; "[W]here a character is visually depicted, and contains the requisite attributes of originality, a character is sufficiently delineated to receive copyright protection.").  Comic book characters are both graphically depicted and portrayed through literary text.

A character may warrant *per se* copyright protection even if it looks or acts markedly different from one appearance to the next.  For example, one district court found protectable the British spy character James Bond, notwithstanding that *four different actors had played him* over sixteen films.  *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296.  "[B]ecause many actors can play Bond is a testament to the fact that Bond is a unique character whose specific qualities remain constant despite the change in actors."  *Id.*  Moreover, a district court held that Godzilla was sufficiently delineated, notwithstanding the character's inconsistency of having "shifted from evil to good."  *Toho Co.*, 33 F. Supp. 2d at 1216 ("an underlying set of attributes . . . remain in every film," namely "a pre-historic, fire-breathing,

---

[3] Nimmer interprets *Air Pirates* as suggesting "an undermining" of the earlier, limited view of character rights in *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945, 949-50 (9th Cir. 1954).

gigantic dinosaur alive and well in the modern world"). Thus, consistency of character in every respect is not required. *Id.*; *see also Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296.

Inanimate objects closely associated with well-known characters also have been granted copyright protection as characters. In *Halicki*, this Court held that an inanimate car could warrant character protection due to its fictional characteristics. 547 F.3d at 1225. The car "Eleanor" appears in a 1974 film as "a yellow 1971 Fastback Ford Mustang" and then in the 1995 remake as "a 1967 Shelby GT-500, a variant of the Ford Mustang." *Id.* In both films, Eleanor is inanimate with limited distinctive attributes other than being a desirable car that has proven strangely difficult to steal. *Id.* Nevertheless, this Court held:

> Eleanor "display[s] consistent, widely identifiable traits," and is "especially distinctive." In both films, the thefts of the other cars go largely as planned, but whenever the main human character tries to steal Eleanor, circumstances invariably become complicated.

*Id*. (noting further that Eleanor was "more akin to a comic book character than a literary character"). In *New Line Cinema Corp. v. Russ Berrie & Co.*, the court similarly held that Freddy Kreuger's glove from the *Nightmare on Elm Street* films was protectable as a character because it is a "component part of the character which significantly aids in identifying the character." 161 F. Supp. 2d 293, 302 (S.D.N.Y. 2001) (citing *New Line Cinema Corp. v. Easter Unlimited, Inc.*, 17 U.S.P.Q.2d 1631, 1633 (E.D.N.Y. 1989)).

In light of these decisions, there cannot be any dispute on this record that the Batmobile, as depicted in images, narrative, plot and dialogue in DC's Comics, is a protectable character under copyright law.  As with James Bond, the Batmobile's many updates attest to its strength as a character, not weakness in protectability. *See Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296.  In addition, as the District Court remarked, the Batmobile warrants protection because it is "used to display the Batman persona."  (ER 55.)  *See Russ Berrie & Co.*, 161 F. Supp. 2d at 295. Towle's unsubstantiated, conclusory assertions to the contrary cannot prevent summary judgment.  *See Anderson*, 1989 WL 206431, at *8 ("Plaintiff's unsupported assertions that Rocky is merely a stock character, made in the face of voluminous evidence that the Rocky characters are copyrightable, do not bar this Court from granting summary judgment on this issue." (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986))); *accord Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989) ("mere disagreement" or "bald assertion" insufficient to preclude summary judgment).  Accordingly, the District Court properly held that the Batmobile warrants character protection.  (ER 50.)

### 3. The Batmobile is Protectable as an Element of a Literary Work

Although the finding is supported by ample case law, the Court need not determine that the Batmobile is a character *per se* to hold that it is separately protectable under copyright and infringed by Towle's Replicas.  Copyright law as

it applies to literary works does not hold characters to any higher standard than it does to a plot, setting, prop or other sufficiently delineated element of the author's creative work.  *See* 3 *Nimmer* § 13.03(E)(3)(b)(v); *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 361 (9th Cir. 1947) (holding "mere copying of a major sequence" constitutes infringement); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825 (9th Cir. 2002) (holding similarities in three art works contained in children's book could constitute infringement); 1 *Nimmer* § 2.12 ("The issue of whether a character from a work of fiction is protectable apart from the story in which such character appears, is in a sense more properly framed as relating to the degree of substantial similarity required to constitute infringement rather than in terms of copyrightability *per se*.").  The Batmobile is a protectable literary element because it is sufficiently delineated by its many consistent and well-depicted features discussed above.

### 4.    The Replicas are Unauthorized Derivative Works that Infringe the Batmobile

Just as there is no question that the 1966 and 1989 Batmobiles would be infringements if DC had not permitted their creation, there can be no factual question that Towle's unauthorized copies are infringing derivative works of the Batmobile.  Under the threshold extrinsic test, the Replicas are substantially similar to the Batmobile displayed in the Comics.   Both Replicas are black and aerodynamic with scalloped batfins, a bat-themed front bumper, exaggerated front

fenders, a jet engine after-burner, significantly-curved windshields, bat symbols throughout and numerous fantastical bat-themed gadgets, including the Bat Phone. (ER 1126-144, 1434-459.)  These expressive elements appeared in the Comics. (ER 1460-1511.)  *See Apple Computer*, 35 F.3d at 1442.

The similarities are unquestionably substantial, as evidenced by Towle's repeated *promises* to prospective buyers that ordinary members of the public will associate the Replicas with Batman.  (*See, e.g.*, ER 1146, 1147, 1149.)  Towle's high fees (up to $90,000) also indicate that consumers and the public recognize the Replicas as based on Batman.  (ER 1791.)[4]  The Replicas are thus substantially similar to the Batmobile and, given that Towle does not contest that he had access to the Comics (ER 58), the Replicas constitute infringements.  *Feist Publ'ns*, 499 U.S. at 361 (requiring substantial similarity, defendant's access and plaintiff's ownership to prove infringement).

Indeed, courts have held that unauthorized remakes – even those that differ significantly – infringe the underlying work.  In *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), the court affirmed the finding that a novel named *60 Years Later: Coming through the Rye* was substantially similar to the famous *Catcher in the Rye*.  Although it did not contain any verbatim excerpts of *Catcher* or tell the same

---

[4] Even if these associations are in part a result of the Series, the Series itself is a derivative work based on the Comics.  (ER 580-82.)

story, *60 Years* centered on an older character based on Holden Caulfield and contained "similar scenes" to those in *Catcher*. Promotional efforts to sell the later work exacerbated the injury from the infringement, where *60 Years* was advertised as a sequel to the classic and where the author referenced Caulfield in an interview. *Salinger*, 607 F.3d at 72; *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1267 (11th Cir. 2001) ("While . . . the characters, settings, and plot taken from [*Gone with the Wind*] are vested with a new significance when viewed through the character of Cynara in [*The Wind Done Gone*], it does not change the fact that they are the very same copyrighted characters, settings, and plot."); *accord Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (holding disparities are irrelevant where "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same") (L. Hand, J.)

Although Towle repeatedly points to the differences between the works (Br. at 44-47), these do not prevent a finding of substantial similarity. "It is entirely immaterial that in many respects plaintiff's and defendant's works are dissimilar if in other respects similarity as to a substantial element of plaintiff's work can be shown." 3 *Nimmer* § 13.03[B]. While the Replicas may vary in some ways from the renderings in the Comics, they still contain the dark color, sleek profile, bat-themed front end, exaggerated fenders, jet engine after-burner, batfin motif and

curved windshield, as well as the assortment of switches, lights and dials associated with its many gadgets. (ER 1146-73.) Moreover, Towle repeatedly identifies the Replicas using the Batmobile name and other Bat-names (ER 1147, 1149), thereby admitting their aesthetic similarity to the Property. *See Walt Disney Prods. v. Air Pirates*, 345 F. Supp. 108, 114 (N.D. Cal. 1972); 1 *Nimmer* § 2.12. Accordingly, there can be no doubt that the Replicas are substantially similar to the Batmobile and constitute infringements.[5]

### C.    Towle Infringed DC's Copyrights in the 1966 and 1989 Batmobiles

Similarly, there is no serious question that Towle infringed DC's rights in the derivative 1966 and 1989 Batmobiles. Towle admits he copied these Batmobiles, and, under the relevant agreements, DC retained rights in the Property (including the Batmobile) and obtained extensive rights in any updated elements.

---

[5] Towle's transformation of the Batmobile into a working automobile does not entitle him to any safe harbor. "[M]aking decisions that enable one to reproduce or transform an already existing work into another medium or dimension – though perhaps quite difficult and intricate decisions – is not enough to constitute the contribution of something 'recognizably his own'" under copyright. *Entm't Research Grp.*, 122 F.3d at 1218 (citing 1 *Nimmer* § 2.08); *see also Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n.4 (9th Cir. 1983). This is especially the case here, where Barris and Furst made these decisions first and did so with DC's express authorization.

### 1. Towle Infringed DC's Merchandising Rights in the 1966 and 1989 Batmobiles

As a divisible right, *see* 17 U.S.C. § 201(f)(2), a copyright comprises a series of exclusive rights which may be separately transferred or reserved. *See* Discussion I.A, *supra*. As discussed above, DC reserved merchandising rights to the Property and to the 1966 and 1989 Batmobiles in its agreements. (ER 580-606, 617-643.) For both the 1966 and 1989 Batmobiles, "merchandising rights" included broad, exclusive rights to produce, sell and license "endorsements, commercial tie-ups or manufacturing privileges." (ER 594-95, 623-24.) These rights alone are sufficient to establish infringement because Towle's Replicas are indisputably merchandise. (*Id*.)

Towle argues that Barris, not DC, owns the rights to the 1966 Batmobile, but this is belied by the record, as Barris himself could not build and sell Batmobile replicas unless explicitly authorized by DC. This is evident under the law discussed above, *see* Discussion I, II.B, *supra*, and confirmed by the agreements themselves. (ER 580-606, 617-643.) For example, the 1966 Barris Agreement authorized Barris to create *only two exhibition vehicles* and display them for a limited term, and only after submitting details of the exhibition for DC's approval, paying DC a significant royalty, permitting DC an audit right, affixing to the vehicles copyright and trademark notices in DC's name and agreeing that all resulting good will belongs to DC. And the record contains *no* evidence that Furst

was authorized to produce replicas. Accordingly, the notion that Towle – who has never entered into any agreement with DC – could offer and sell the Replicas without DC's permission is absurd.

### 2. Towle Infringed DC's Copyrights in the 1966 and 1989 Batmobile Designs

Moreover, Towle has infringed DC's rights under copyright in the designs of the 1966 and 1989 Batmobile because their designs derive from the Batmobile portrayed in the Comics. As established by the agreements, the 1966 and 1989 Batmobiles are derivative works of the Batmobile. Each is an updated Batmobile commissioned by DC's licensees for use in the Series or Film. *See* 17 U.S.C. § 101 (definition of "derivative work"). Like the Replicas, the 1966 and 1989 Batmobiles are substantially similar to the Batmobile because they share a host of similar expressive visual elements. Furthermore, the 1966 and 1989 Batmobiles are portrayed (throughout the Series and Film) with the Batmobile's non-visual characteristics. Critically, in the agreements authorizing the 1966 and 1989 Batmobiles, DC expressly retained all rights in the Property and the material newly contributed to the Batmobiles. We discuss the specific details of each work in the following paragraphs.

The 1966 Batmobile. DC granted Barris the right to build and exhibit the 1966 Batmobile and to use the DC Marks in connection with it – provided that Barris paid DC a royalty, posted copyright and trademark notices in DC's name,

and agreed that all good will resulting from the exhibitions belonged to DC.  (ER 607-616.)  Moreover, DC retained all rights in the name and mark BATMOBILE, in the referenced drawings, and in the myriad required features which were expressly delineated in the 1965 Barris Agreement.  (ER 1291-1303.)  Given this agreement's twice-limited grant, Barris, Fox and Greenway could own no rights in the underlying Batmobile or DC's trademarks.  They could only own rights in the 1966 Batmobile's new design elements that did not pertain to the twenty-one listed features, were not contained in the attached drawings to the 1965 agreement, and were not features of the underlying automobile upon which the 1966 Batmobile was built.  (ER 1294-95.)  In addition, because the grant did not transfer DC's pre-existing copyrights in the Batmobile as it was featured in the Comics, any design elements of the Batmobile that appeared in the Comics remained the property of DC.  *See Warner Bros. Pictures*, 216 F.2d at 949 ("The clearest language is necessary to divest the author of the fruits of his labor." (internal quotation marks omitted)); *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989) (construing language purporting to transfer copyright in favor of "protection of the author's rights").

Thus, while Barris, Fox and Greenway may have modest rights in certain newly added design elements of the 1966 Batmobile, such rights are at best extremely limited and difficult to identify; indeed, Towle has identified none.  On

the other hand, copyright in the Batmobile has remained with DC and DC has continued to police these rights, as it has in all aspects of the Property. (ER 1294-95.) Accordingly, Towle's described "replica" of the 1966 Batmobile infringes DC's copyright.[6]

The 1989 Batmobile. DC holds all rights under copyright to the 1989 Batmobile because it explicitly retained rights to the Batmobile and Property generally, and to Additional Elements of design included in the Film. (ER 622-24, 32-33.)[7] *See* Statement of Fact 3.C(a), *supra*. Certainly, Furst could have no rights under copyright since he created the 1989 Batmobile under a work-for-hire agreement. (ER 301, 312, 653-54.) And, as with the 1966 Batmobile, Towle admits his Replica is a copy of the 1989 Batmobile, and, therefore, it is an

---

[6] Towle asserts that the 1966 Batmobile is not a derivative work because Barris designed it "based completely on his own design." (Br. at 45.) The only proof cited to support this is the following from Barris's deposition: "Q: [W]hen you were deciding how the Batmobile was going to look, were you given some drawings or photographs or comic books to look at first? A: No." (ER 1771.) However, this does not establish that Barris designed the 1966 Batmobile without access and reference to the Comics or that he had not seen Batmobile images prior to completing his design. Rather, Barris said only he was not *given* any drawings *at that time*. He also testified that he based the design *on the script*, which was based on and bound by the Comics. (ER 1771 ("I would visualize the basic car and what I wanted to create for a Batmobile that was reflected to the script . . . ."), ER 600.) Moreover, there is no evidence that Barris or his staff was unfamiliar with the Batmobile. (Br. at 45.)

[7] Towle does not dispute this, but argues instead that there is a "gap of title" within Warner Bros. regarding the 1989 Batmobile. (Br. at 38-41.) The District Court properly rejected this flawed argument for several reasons discussed in Section III.D.1, below.

infringement thereof.  Moreover, although both the Series and Film are registered by DC's licensees, DC meets the standing and pleading requirements of 17 U.S.C. § 410 because it owns the exclusive right under copyright that it seeks to vindicate, *see, e.g.*, *Vestron, Inc. v. HBO, Video Inc.*, 839 F.2d 1380 (9th Cir. 1988) (plaintiff owner only of video cassette distribution rights in movies produced and owned by other parties).

### 3.    Towle Infringed DC's Copyrights in the 1966 and 1989 Batmobiles as Pictorial, Graphic or Sculptural Works

Towle also has infringed DC's rights under copyright in the 1966 and 1989 Batmobiles because they are protectable "pictorial, graphic, and sculptural works." As the District Court held, the 1966 and 1989 Batmobiles are protectable under copyright as "pictorial, graphic, and sculptural works" under 17 U.S.C. § 102(a)(5), not merely as literary elements.  (ER 58.)  Pictorial, graphic, and sculptural works:

> shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101.  The legislative history Towle cites allows for protection for "the shape of an automobile . . . [if it] contains some element that, physically or conceptually, can be identified as separated from the Utilitarian aspects of that

article."  H. Rep. at 55.  Physical separability means that a "pictorial, graphic or sculptural feature incorporated into the design of a useful article . . . can be physically separated from the article without impairing the article's utility, and if, once separated, it can stand alone as a work of art traditionally conceived." *Leicester v. Warner Bros.*, 232 F.3d 1212, 1219 n.3 (9th Cir. 2000) (internal quotation marks omitted).  Conceptual separability means that a pictorial, graphic or sculptural feature "can stand on its own as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it."  *Id.* (internal quotation marks omitted).

Towle argues extensively that his Replicas are functional objects not entitled to copyright protection.[8]  (Br. at 53-62.)  As the District Court noted, however, this argument is misplaced and illogical.  First, the functionality of an object that is portrayed in words in a literary work, or graphically in a pictorial, graphic or sculptural work, cannot render a writer's or artist's expressive contribution to such work unprotected under the Copyright Act.  Copyright protection is afforded for "original works of authorship," *i.e.*, the expressive creative aspects of author's work, *see* 17 U.S.C. § 102(a), and has nothing to do with anything else.  "Eleanor" as presented in a motion picture was not merely an automobile and just a

---

[8] Towle also contends that the District Court "failed to [conduct this analy[sis]," notwithstanding the several pages of the order devoted to it.  (ER 56-58.)

functional car, and Freddy Kruger's glove was not merely a glove or just a functional weapon. Rather, each played roles as creative elements, namely, copyrightable characters whose special capabilities and uses comprised story elements in motion picture works. *Russ Berrie & Co.*, 161 F. Supp. 2d at 302; *Halicki*, 547 F.3d at 1224.

Second, the images and storylines in the Comics existed years before any functional vehicles were constructed.

Third, the registrability of the Replicas is irrelevant. *See, e.g.*, *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 722 (9th Cir. 1984) (in infringement case, "[i]t makes no difference that the [derivative work] may not satisfy certain requirements for statutory copyright registration itself."). The issue is whether Towle's manufacture and sale of unauthorized derivative works infringe the copyright in DC's works. Utility prohibits copyright protection for cars *as cars*, but Towle transforms functional cars into cars that are unauthorized Batmobile replicas. He does this by adding DC's protectable, expressive elements to the cars. The fact that he is adding these elements to a functioning car does not render the modified car non-infringing simply because it continues to operate as a car.

Fourth, as the District Court observed, the Batmobile only functions as a Batmobile in a make-believe world, and the expressive elements separate from any

utility the car might have do not function.  For example, the warning lights atop the vehicle – which could theoretically have utilitarian purpose if actually used to fight crime – never functioned because they never actually warned the public of danger or cleared the streets of traffic.  These elements merely depicted features of an imaginary crime-fighting vehicle in an artistic medium.[9]  The statute Towle cites defines a "useful article" as "an article having an intrinsic utilitarian function *that is not merely to portray the appearance of the article* . . . ."  17 U.S.C. § 101.  The protectable elements of the 1966 and 1989 Batmobiles are *precisely* that, props meant to portray the appearance of a fantasy car, and thus do not fall within the definition.[10]

Fifth, the 1966 and 1989 Batmobiles have numerous protectable, non-functioning – fictionally or otherwise – separable features, such as the decorative

---

[9] To support his functionality argument, Towle cites only one case involving the rejection of a copyright application for a wire-spoked car wheel cover.  "The pattern resulting from the placement of spokes is an inseparable component of the wheel cover . . . [because t]he spokes are attached to the rim and to the hub, and once the spokes are removed from their position the pattern ceases to exist." *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 923 (11th Cir. 1983).  Here, there is no evidence that the Batmobile features would cease to exist if removed from the vehicle.  The bat sculptures upon the hubcaps would keep their shape, as would the scalloped batfins, the Batphone, parachutes, switches, monitors, levers, dials, and so on.

[10] This Court's recent decision in *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 739 F.3d 446 (9th Cir. 2014), which held that a hookah water container's shape was not conceptually separable, is distinguishable because the Batmobile is not a useful article, but a prop meant to "portray the appearance" of a literary element.  *See* 17 U.S.C. § 101.

bat emblems, the scalloped batfins and the swollen fenders.  Towle's contentions that such features are not separable from the vehicles is perplexing given that he sells them in a *kit*.[11]  (ER 288, 315)

Finally, as the District Court correctly noted, were the 1966 and 1989 Batmobiles functional, their unprotectable status would not wrest from DC its longstanding prior rights in the Batmobile as a part of a literary property.  (ER 55 (citing *Lewis v. Gallob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 968 (9th Cir. 1992); *Lone Ranger Television*, 740 F.2d at 722-23; *Entm't Research Grp.*, 122 F.3d at 1218).)  Were Towle able to turn a protectable *fictional* element into an unprotectable *functional* element merely by building one that functioned, then every replica based on an entertainment property could potentially divest the copyright owner of rights in these elements, a result that makes no sense.

### D.     Towle's Additional Arguments Regarding Copyright Infringement are Meritless

Towle attempts several additional arguments in an effort to stave off DC's copyright infringement claim.  The District Court correctly dismissed them all.

---

[11] Towle references a chart (ER 196-203) reflecting his own "expert" opinion regarding which features of the 1966 and 1989 Batmobiles' are functional.  (Br. at 29)  It is not apparent what Towle means by functional, *e.g.*, he considers a "jet engine exhaust pipe" functional, even though it is "not a true exhaust pipe, but is meant to resemble one."  *Id.*  The chart also erroneously indicates that the Replica contains a Batscope.  (*See* ER 1027 ("I don't have a bat scope in my car.").)

### 1.    There is No "Gap" in Title Regarding the Furst Agreement

Towle argues that DC does not own the 1989 Batmobile because of a purported "gap" in title because WBPL executed the Furst Agreement while WBI produced the Film and because DC has submitted only testimonial evidence that the entities are related, which he claims is hearsay.  (Br. at 37-40.)  Towle is wrong.

As an initial matter, Towle's argument that there is a gap in title is red herring because DC's rights have nothing to do with the purported "gap."  At the time DC granted motion picture rights to BPI in 1979, years before any agreement between DC's licensee and Furst, DC expressly reserved its rights, not only in the Property, but in all merchandising rights and in any "Additional Elements" related to the Property.  (ER 622-24, 632-33.)  DC's express reservation of rights trumps any alleged downstream break in the chain of title since WBPL could not own or grant to Furst rights that DC had expressly reserved.   In addition, and as demonstrated above, DC's copyright in the Batmobile stems from its unchallenged rights in the underlying Comics.

Even to the extent there was a technical gap in DC's title to the 1989 Batmobile, this could not benefit Towle because he has no standing to make this argument.  It is true that transfers of exclusive rights under copyright since January 1, 1978, the effective date of the 1976 Copyright Act, are required to be in writing,

*see* 17 U.S.C. §§ 204(a), 101 (defining "transfer"). But, as a defendant in an infringement case who has introduced no evidence of a copyright ownership dispute between DC and its licensees or predecessors-in-interest, Towle has no standing to challenge an alleged gap in DC's title. "[W]here 'the copyright holder appears to have little dispute *with its licensee* on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996) (emphasis added) (citing *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982)). In *Magnuson*, there was testimony, but no timely writing to support assignment between clearly related entities. 85 F.3d at 1428; *see also Zenix Indus. USA, Inc. v. King Hwa Indus. Co.*, 920 F.2d 937 (9th Cir. 1990).

Regardless, Towle's argument fails because the gap he identifies does not exist. DC has presented uncontroverted evidence that WBI and WBPL are related entities: DC licensed WBI to make the Film (ER 617-652, 661-687); WBPL hired Furst to work as a production designer on the Film (ER 311, 653-54, 1557-58); and Furst designed the 1989 Batmobile which was shown in the Film (ER 655-660, 1279-283). This evidence of the facts relating to production and creation of the Film provides more than a sufficient basis for the District Court's ruling relating to DC's ownership rights – it shows that WBI and WBPL are related entities that worked as one to produce the Film. The Film could obviously not have been made

without the authorization of all of those who worked together on the project, including DC.

In addition, Wayne Smith, a senior lawyer for Warner Bros. Entertainment Inc. ("WBEI"), WBI's successor-in-interest, testified based on his thirteen years of working knowledge and familiarity with corporate records and WBEI's numerous agreements regarding the Film *that were executed by WBPL* that WBI and WBPL were "affiliated" companies. (ER 1557-58.) Jay Kogan, DC's Deputy General Counsel, based on his over twenty years working knowledge and experience, also testified that WBI and WBPL are "affiliated." (ER 1553.) Both Smith and Kogan provided evidence of their own credentials and employment to establish the basis for their personal knowledge. *See* Fed. R. Evid. 602. Towle offered no contrary evidence.

Towle's only objection to the Smith and Kogan testimony was based upon a claim of hearsay. The standard for review for evidentiary decisions is abuse of discretion. *Gen. Electric*, 522 U.S. at 141; *Smith v. Airborne Freight Corp.*, 172 F.3d 58 (9th Cir. 1999). Because Towle's objections have no basis in fact or law, the District Court properly overruled them (Br. at 7),[12] and Towle cites no law to

---

[12] The statements to which Towle has raised evidentiary objections are contained in the Kogan Declaration at ¶¶ 3, 6-8, and the Smith Declaration at ¶¶ 3, 5. (ER 74-75, 332-38, 1551-58.)

support his argument on appeal, merely asserting that the statements constitute hearsay (Br. at 16-17 n.3, 19, 37, 39-40).

In fact, the statements at issue were not hearsay because they were offered against an opposing party by a person whom the proponent party authorized to make a statement on the subject. Smith entered a sworn declaration on behalf of WBEI. (ER 848.) Kogan entered a sworn declaration on behalf of DC and was noticed for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). Any statements regarding "chain of title," including those relevant to whether WBPL's rights under the Furst Agreement were transferred to or shared with WBI, relate to the testifying entities' records and corporate structure and are excluded from hearsay under Federal Rule of Evidence 801(d)(2)(C) and (D). *See, e.g.*, *Williamson v. Life Ins. Co. of N. Am.*, 10-CV-0499 (KJD), 2012 WL 3262857, at *1 n.1 (D. Nev. Aug. 8, 2012) (sworn affidavit of corporate representative noticed for 30(b)(6) deposition is admissible); *HTI Holdings, Inc. v. Hartford Cas. Ins. Co.*, 10-CV-6021 (TC), 2011 WL 4595799 (D. Or. Aug. 24, 2011); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 973 (C.D. Cal. 2006) (emails of corporate officers or employees are admissible non-hearsay under Rule 801(d)(2)(D)); Charles A. Wright & Arthur R. Miller, 8A *Federal Practice & Procedure: Civil* § 2103 (3d ed. 2010) ("There is no obligation to select a person with personal knowledge of the events in question"). And, again, Towle

offers no evidence that WBI and WBPL are *unrelated* entities.  At summary judgment, "[i]f the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *Milne v. Stephen Slesinger, Inc.*, 02-CV-8508 (FMC)(PLAx), 2007 WL 7646410, at *7 (C.D. Cal. Feb. 15, 2007) (quoting Fed. R. Civ. P. 56(e)).  Towle has failed to do this or even to provide any evidence that undermines DC's proof.  As such, Towle advances only a "bald assertion," which cannot defeat summary judgment.  *Id.* at *8 (citing *Harper*, 877 F.2d at 731).

In sum, Towle's "gap in title" argument are without merit.

### 2.    The 1965 ABC Agreement was Binding upon Greenway and Fox

Towle also contests DC's rights in the 1966 Batmobile because DC retained its rights in an agreement with ABC, the 1965 ABC Agreement (ER 580-606), not with Fox and Greenway, the producers of the Series.  (Br. at 33-35.)  However, the 1966 Barris Agreement among DC, Fox, Barris and Greenway (1) provides that Fox and Greenway were retained by ABC to produce the series, "pursuant to" the 1965 ABC Agreement; (2) confirms that DC "is the owner of all copyrights . . . to the feature BATMAN, and to all the contents of said feature, including the Batmobile"; and (3) reaffirms that any rights of Barris in the Batmobile are "subject to any and all right, title and interest of [DC] in and to said Batmobile

features in said design." (ER 607.) Through a declaration uncontroverted in substance by Towle, DC's Deputy General Counsel confirmed that ABC worked together with Fox and Greenway to produce the Series. (ER 1552.) Again, Towle did not put forward any evidence to refute this point either on summary judgment or this appeal.

### 3. Unilateral Design Patent Filings for Derivative Works do not Negate DC's Copyrights in the Batmobile

Towle argues that DC cannot own copyrights in the 1966 and 1989 Batmobiles because Barris and Furst each filed a design patent for his design, which, under a pre-1995 Copyright Office regulation, precludes copyright registration. (Br. at 47-48.) Again, Towle ignores DC's underlying rights in the Batmobile irrespective of the 1966 and 1989 Batmobiles. But, in any event, DC's rights in the 1966 and 1989 Batmobiles are unaffected by the design patent filings.

First, the pre-1995 text of the Copyright Office Regulations, 35 C.F.R. § 202.10(a), on which Towle relies for the proposition that no one could obtain both copyright and design patent protection for the same design, did not have legal force at any relevant time. The so-called "election of protection" theory was judicially nullified by the Supreme Court's watershed decision in *Mazer v. Stein*, 347 U.S. 201 (1954), *forty-one years* before the Copyright Office withdrew this portion of its regulations in 1995.

In *Mazer*, the Court ruled that the same disclosure or publication could support both design patent and copyright registrations, effectively overturning earlier Second Circuit cases on which the Copyright Office had based its election of protection regulation.  Following *Mazer*, the U.S. Patent & Trademark Office stopped recognizing this doctrine in 1974, *In re Yardley*, 493 F.2d 1389 (C.C.P.A. 1974), allowing for overlapping protections.

In amending the pre-1995 regulations to remove entirely the preclusive provision in section 202.10(a), the Copyright Office specifically cited with approval and with the sole comment "we agree," the following observation by Nimmer:

> There appears to be no statutory or other justification for this position [doctrine of election].  It would seem on principle that if a work otherwise meets the requirements of copyrightability, it should not be denied such simply because the claimant happens to be entitled to supplementary protection under other legislation.

1 *Nimmer* § 2.19 (cited in 60 Fed. Reg. 57 (Mar. 24, 1995), Copyright Office, Library of Congress, Policy Decision & Amendment of Regs. – Registrability of Pictorial, Graphic, or Sculptural Works Where a Design Patent Has Been Issued.

Towle's argument here also ignores that DC is suing for infringement, not the right to register, and that the Copyright Office decades ago issued registrations for the Series and Film.  (Br. at 48.)  Under section 410(a) of the Copyright Act, the issuance of a copyright registration means that the Register of Copyrights has

determined that the material deposited, the Series and the Film, "constitutes copyrightable subject matter."  17 U.S.C. § 410(a).  Moreover, "[i]n any judicial proceedings, the certificate of registration made before or within five years after first publication shall constitute prima facie evidence of the validity of the copyright and the facts stated in the certificate."  17 U.S.C. § 410(c).

Most importantly, the abandoned regulation Towle cites never purported to affect a registrant's right to sue for infringement, and it certainly could not do so, given the 1954 judicial rejection and 1995 regulatory repudiation of the election of protection doctrine, which – in the words of the Copyright Office – never had any "statutory or other justification."  60 Fed. Reg. 57.

### 4.     Towle had Sufficient Notice of the Relevant Copyright Registrations

Finally, Towle argues that he lacked adequate notice of the copyrights at issue because the FAC did not reference the copyright registrations for the Series and Film.  (Br. at 48-50.)  However, Towle asked the District Court to take judicial notice of certain of these very registrations early in the case, which it did.  (ER 1816-17, 1842-45.)  Moreover, the FAC identified the Series and Film as two of the infringed works (ER 1902-03, 1929-30), and Towle admits that his products are "Replicas" of the Batmobiles shown in the Series and Film (ER 1146, 1147, 1149).   Indeed, Towle's chief defense is that DC does not own *these two*

*registrations*.  (Br. at 25.)  Thus, the notion that Towle has been litigating below without knowledge of these two registrations is nonsensical.

In any event, Towle provides no support for the position that a complaint must attach each relevant copyright registration as an exhibit thereto.  The two cases cited involve complaints that *do not adequately describe the work infringed*.  *See Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005); *Bespaq Corp. v. Haoshen Trading Co.*, 04-CV-3698 (PJH), 2005 WL 14841 (N.D. Cal. Jan. 3, 2005).  Here, DC made clear that Towle was infringing the Batmobile from the Comics, Series and Film.

*     *     *

In conclusion, there is no genuine issue of fact in dispute that the Replicas infringe DC's many rights under copyright in the Batmobile.  The District Court's order with respect to DC's copyright claims should be affirmed.

## III.   TOWLE'S REPLICAS INFRINGE DC'S TRADEMARK RIGHTS

The District Court held that Towle willfully infringed the DC Marks in violation of trademark and unfair competition laws.  Towle only half-heartedly challenges the holdings.  (Br. at 25-26.)  Indeed, he effectively admits the trademark violations by stating he would like to continue marketing his vehicles

without using DC's marks.  (Br. at 3-4.)  Nonetheless, DC briefly addresses these claims here.[13]

## A.    The Replicas are Likely to Cause Confusion

To demonstrate trademark infringement, DC must show that (1) it has a valid protectable mark and (2) Towle's use of the mark likely causes confusion. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).  Towle stipulated to DC's valid rights, including in the Bat Emblem marks, Bat Rep II mark, BATMAN word mark, and BATMOBILE word mark in various classes. (ER 312.)  Further, Towle does not dispute that he used the DC Marks on automobile parts and accessories and has done business through batmobilereplicas.com.    (ER 316.)    Towle's websites also display the BATMOBILE mark.  (ER 1055-57.)

Thus, the only contested aspect of DC's trademark claim was likelihood of confusion.  *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999).  The Ninth Circuit provides a non-exhaustive list of factors to consider on likelihood of confusion:  (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

---

[13] Claims for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards as those for trademark infringement.  *See Fleischer Studios, Inc. v. A.V.E.L.A. Inc.*, 772 F. Supp. 2d 1155, 1167 (C.D. Cal. 2009) (citing *Toho*, 33 F. Supp. 2d at 1210).

confusion; (5) marketing channels; (6) the type of goods offered and the degree of care likely to be exercised by purchasers; (7) defendant's intent; and (8) likelihood of expansion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). "The factors should not be rigidly weighed," but are meant to guide the court in assessing likelihood of confusion. *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002) (citations and internal quotation marks omitted). Applying these factors to the undisputed evidence here demonstrates that any reasonable fact finder would find that confusion is likely, as each factor weighs in favor of a finding of likelihood of confusion. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

### 1.    The DC Marks are Strong

"The stronger a mark . . . the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058; *see also E. & J. Gallo Winery*, 967 F.2d at 1291 (strength derives from inherent distinctiveness and acquired distinctiveness). Inherent distinctiveness is governed by the mark's place on the spectrum of categories set out in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ((1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful). The most distinctive marks are fanciful because they are "wholly made-up terms." *Brookfield*, 174 F.3d at 1058 n.19. The District Court properly determined that DC's Word Marks are fanciful because they are coined, non-

descriptive terms. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998). Nonverbal marks, such as the Bat Designs, gain strength through "acquired distinctiveness," *see Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1127 (C.D. Cal. 2001), which is the consumer's association of the mark with a particular source; the stronger the association, the more distinctive, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). DC's registrations for the design marks provide *prima face* evidence – if not conclusive proof – of the marks' secondary meaning. *See* 15 U.S.C. § 1115(a) (registered marks), (b) (incontestable marks). Moreover, consumer association of the Bat Designs with DC is enormously strong thanks to Batman's fame. (ER 299.)

## 2.    The Goods and Services are Identical

Consumer confusion is likely "[w]here goods are related or complementary." *E. & J. Gallo Winery*, 967 F.2d at 1291. The goods here are identical. DC's licensees offer toy and replica 1966 and 1989 Batmobiles, as well as a vast array of goods including comics, clothing and automotive accessories, under the DC Marks. (ER 312.) Towle manufactures replica 1966 and 1989 Batmobiles and automotive accessories. (ER 315.)

### 3.    The Marks are Identical

Similarity between the marks increases likelihood of confusion.  *Brookfield*, 174 F.3d at 1054; *see also E. & J. Gallo Winery*, 967 F.2d at 1291 (weighing similarities more heavily than differences).  Here, the word marks are identical, as Towle has used BATMAN and BATMOBILE to promote his Replicas.  (ER 316.) Moreover, Towle's design mark is virtually identical to DC's Bat Design Marks, as shown here:



(ER 1134.)  Moreover, any differences between the marks are imperceptible to consumers who view Towle's marks in public, apart from the DC Marks, and affixed to a car slavishly modeled on the famous 1966 Batmobile.  *See Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Comp.* ("*McCarthy*") § 23:60 (4th ed. 2013).

### 4. Towle Willfully Infringed the DC Marks

Both knowledge of the senior user's mark and "intent to confuse constitute[] probative evidence of likely confusion." *Sleekcraft*, 599 F.2d at 354; *see also Playboy Enters., Inc. v. Netscape Commn'cns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Courts assume that the defendant's intentions were carried out successfully."); 4 *McCarthy* § 23:110. Towle admits knowledge of DC's Marks, and his intent to trade off of DC's goodwill is patent. (ER 316, 1146, 1149.) Without such goodwill, Towle likely would be unable to command $90,000 for his Replicas. *See* 4 *McCarthy* § 23:110.

### 5. Actual Confusion Occurred

"[A]ctual confusion . . . constitutes persuasive proof that future confusion is likely." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001) (internal quotation marks omitted). Actual confusion includes "initial interest confusion," any confusion "dispelled before an actual sale occurs." *Playboy Enters.*, 354 F.3d at 1025. Here, Towle himself admits that "most" of his potential customers asked about his relationship with Warner Bros. (ER 1022-23.) The District Court specifically found that these inquiries constituted actual confusion, given the doctrine of initial interest confusion. (ER 28, 1022-23.) Indeed, one customer purchased a Replica only after requesting and receiving information from Towle regarding whether the 1966 Batmobile had entered the

public domain.  (ER 1023.)  Towle sent only the expired design patent, in effect

misleading the consumer as to WBI's and DC's rights in the 1966 Batmobile.  (*Id.*)

Moreover, although the District Court did not discuss it, post-purchase confusion is

likely since Towle's consumers drive the Replicas in public.  (ER 1146-150.); *see*

*Acad. of Motion Picture*, 944 F.2d at 1456; *see also Levi Strauss & Co. v. Blue*

*Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980).

### 6.    Marketing Channels are Identical

The Court must consider whether "the predominant purchasers of the

parties' goods are similar or different."  *Glow*, 252 F. Supp. 2d at 1000.  Here, the

parties' marketing channels are identical.  Both parties promote and sell the goods

and services on the internet and at car shows.  (ER 765-67, 922, 996, 1146-157).

*See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1365 (9th Cir. 1985).

### 7.    Consumers' Degree of Care is Not
###        Sufficient to Prevent Confusion

This factor focuses on the relevant consumer's relative sophistication and

the degree of care likely to be exercised by that consumer.  *Sleekcraft*, 599 F.2d at

353.  The more sophisticated and careful the purchasers, the less likely they are to

be confused.  *Id*.  Here, Towle has put forward little evidence of consumer

sophistication or care, except for his high price point.  (Br. at 20.)  Yet, price is a

dubious proxy for sophistication.  *Sleekcraft*, 599 F.2d at 353.  Even among buyers

of expensive goods "confusion may still be likely."  *Id*.   Indeed, Towle's

customers' purported sophistication did not prevent initial interest confusion, as "most" of his consumers asked if he was licensed.  (ER 1022-23.)  Moreover, customer sophistication does not prevent post-sale confusion by the general public who associate Towle's products with DC.  (ER 1146-150.)

*    *    *

In short, all of the *Sleekcraft* factors favor DC.  There is no real question that the factual record supports a finding of likelihood of confusion.

### B.    None of Towle's Additional Arguments Undermine Finding of Trademark Infringement

Rather than dispute the District Court's *Sleekcraft* analysis, Towle instead resurrects baseless or irrelevant contentions rejected by the District Court:

First, Towle asserts that he began offering and selling the Replicas under the BATMOBILE mark in 2001, before DC began manufacturing or licensing full-size-Batmobiles.  (Br. at 26.)  This is false.  Since 1966, DC has licensed Barris to manufacture vehicles under the BATMOBILE mark for display in the Series and at exhibitions.  (ER 608-09.)

Next, Towle indicates that he began offering and selling the Replicas before DC's priority dates in its BATMOBILE registrations for "automobiles" and "custom manufacturing in the field of automobiles."  (Br. at 26.)  Even if true, this is of no import.  A trademark owner need not own a prior registration for the precise goods at issue in order to prove infringement, provided it has statutory

rights in related goods or services (such as automotive parts and toy cars, as DC has) or common law, pre-registration, rights in *identical* goods or services (such as licensing Barris to exhibit the vehicle, as DC has). *HMH Publ'g Co. v. Brincat*, 504 F.2d 713, 716 n.7 (9th Cir. 1974) ("an infringement could be found and prohibited under federal law even though goods of different descriptive properties were involved"). As the District Court properly found, DC has strong, longstanding rights in the BATMOBILE mark for "comic books, merchandise, motion pictures, and television programs." (ER 27-28.) Moreover, DC has used the BATMOBILE mark for goods identical and related to Towle's for many decades (ER 1476-1511); and, as discussed above, actual confusion has resulted.

Towle also propounds that he did not affix the BATMOBILE mark to the vehicles themselves. (Br. at 3.) Trademark use is not understood so narrowly as to require affixation. 2 *McCarthy* § 16:27 ("The 'affixation' requirements of the 1946 Lanham Act are less strict than those of the 1905 Act."); *W. Stove Co. v. Geo. D. Roper Corp.*, 82 F. Supp. 206, 216-17 (D. Cal. 1949).

Finally, Towle tries to excuse his blatant trademark infringement and avoid an adverse ruling by this Court, by the expedient of proposing not to use any of the DC Marks in the future. (Br. at 4 ("Towle would like to . . . continu[e] to manufacture these automobiles without using any of DC's trademarks.")) This fails to undo past harm. Moreover, this request improperly seeks an advisory

opinion regarding some different, future, hypothetical course of conduct, which exceeds the Court's Article III powers and should not be issued. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1135 (9th Cir. 2006); *see also Wrenn v. Boy Scouts of Am.*, 03-CV-4057 (JSW), 2008 WL 4792683 (N.D. Cal. Oct. 28, 2008).

### C.    Towle May Not Assert Laches

The Court should also affirm the District Court's denial of Towle's motion as to laches for trademark infringement given that his infringements were knowing and willful.  (ER 59-63.)  Laches is "an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights."  *Jarrow Formulas*, 304 F.3d at 835 (internal quotation marks and citations omitted).  However, the party asserting the laches defense must not have infringed knowingly and willfully.  *Id.* at 841 ("A party with unclean hands may not assert laches.").  As the District Court found, Towle admitted that he knew of the Property and the Bat Designs, intentionally copied the 1966 and 1989 Batmobiles and the trademarks they contained, and used the Batmobile name.  (ER 60.)  Although this is sufficient to prove knowing and willful infringement, Towle even advertised the Replicas (though only at times) as the "Gotham Prowler," he explains, "out of an abundance of caution, and to avoid needless entanglements with DC Comics."  (ER 282; *see* 1056-078.)  Thus, he plainly understood that use of the BATMOBILE mark was improper based on

DC's trademark rights. *See Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000) (cited in *Danjaq L.L.C. v. Sony Corp.*, 263 F.3d 942, 956 (9th Cir. 2001). Since "[l]aches will not bar injunctive relief where a defendant adopted the trade name with knowledge of a plaintiff's rights and objections," *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 963 (6th Cir. 1987), the District Court's ruling on laches should stand.

## CONCLUSION

As the District Court held, DC owns copyrights in the Batmobile, the 1966 and 1989 Batmobiles, and trademark rights in the DC Marks. Towle's admittedly copied Replicas infringe these copyrights and trademark rights on several grounds, such that no reasonable juror could find for Towle. Accordingly, the Court should affirm the District Court's grant of summary judgment for infringement of copyright and trademark rights, dismiss the appeal in its entirety, and enter judgment in DC's favor.

DATED:  February 3, 2014          Respectfully submitted,

Roger L. Zissu
James D. Weinberger
Leo Kittay
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
(212) 813-5900

-and-

J. Andrew Coombs
J. ANDREW COOMBS, A PROFESSIONAL
CORPORATION
517 East Wilson Avenue, Suite 202
Glendale, CA 91206
(818) 500-3200

By:   s/ James D. Weinberger
             James D. Weinberger

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), counsel for

Appellee hereby certifies that the foregoing Appellee's Answering Brief complies

with the type-volume limitation proscribed in Federal Rule of Appellate Procedure

32(a)(7)(B) and was prepared using the following:

> Microsoft Word 2007;

> Times New Roman;

> 14 point typeface.

Appellee's counsel has relied on the word count function of the word-

processing program used to prepare this Appellee's Answering Brief, which

indicates that this brief contains 13,824 words, excluding the parts exempted by

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


Dated:  February 3, 2014          By:    s/ James D. Weinberger
                                         James D. Weinberger

## STATEMENT OF RELATED CASES

To DC's knowledge, no other case presently in this Court is related to the instant appeal.

9th Circuit Case Number(s) | 13-55484

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 2/3/2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ James D. Weinberger

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)